Hillsborough, {
Feb. 2, 1937. }

OMER H. AMYOT & a, *Finance Commission of Manchester,*
*v.*
DAMASE CARON & a, *Mayor and Aldermen of Manchester.*

*Wyman, Starr, Booth, Wadleigh & Langdell (Mr. Langdell* orally), for the plaintiffs.

*Aloysius J. Connor* (by brief and orally) for the defendants.

ALLEN, C. J.   The act (Laws 1921, *c.* 226) which creates and defines the rights and duties of the Finance Commission of Manchester

is outlined in *Attorney-General* v. *Bond*, 81 N. H. 269, 270, 271. As there stated, the members of the commission "must all be inhabitants and qualified voters of the city . . .; their duties relate entirely to the city of Manchester and their service is rendered solely for the benefit of that city; they are to investigate and report as to its financial affairs (*s.* 2); to veto action of the mayor and aldermen as to appropriating money or raising it by borrowing or taxation, or to reduce the amount so appropriated or raised (*s.* 4); no financial paper can be issued by the city without the approval of the commission (*s.* 5); and they have general control over all money appropriated by the city (*s.* 6)."

In further statement, the commission are to make rules to govern business and financial transactions by any city department, official, or agent, so far as deemed necessary "to insure economy and efficiency." The mayor and aldermen fix their compensation and that "of such clerks" as they may employ; and the commission is authorized to incur such expense as is deemed necessary in conducting its investigations, the expense to be a charge against the city "which shall appropriate funds to pay therefor." In their investigations they may summon witnesses by customary process.

The charge of the commission's bad faith in appointing Lepage as an accountant investigator is not to be sustained. The exception raises only the question whether the evidence required a finding of misfeasance. The position is taken that Lepage was a clerk, as the word is used in the statute, whose compensation was therefore to be fixed by the mayor and aldermen. He was found to be a "trained accountant familiar with the business and needs" of the city, and, as found, there was need to engage him "to collect data relative to the probable requirements of the several departments of the city government," to enable the commission to perform its duty in acting upon appropriations made by the mayor and aldermen. The city's auditor was inexperienced and unable "seasonably to furnish the extensive information" the commission required.

It was not the purpose of the statute that the commission should be hampered in its duties of investigation by granting the mayor and aldermen power to restrict and embarrass it; but if a trained accountant were, within the legislative meaning, to be regarded as a clerk, the opportunity to place obstacles and difficulties in the way of the commission's program of accomplishment becomes apparent. The clerks whose pay is to be fixed by the mayor and aldermen are persons furnishing service of a routine character such as bookkeeping,

typing, and stenography, without special executive qualifications and without being in charge of work of special importance. Without exact accuracy of distinction, the legislature has made division between clerical service of a standardized sort and secretarial engagement of a selective type. Otherwise stated, work customarily paid for at scheduled rates is clerical, while service is not which is of expert ability and skill and for which pay is customarily determined in discretion according to its worth in the special case. Lepage was not a clerk in the statutory sense.

The further point is taken that Lepage was not employed for service in the conduct of the commission's investigations. The argument is that investigations, in the statutory use of the word, include only special inquiries, in the nature of hearings by an administrative tribunal, into special matters. This is considered a narrow and erosive view calculated to subvert a full operation of the designed scope of the statute. While special investigations are expressly authorized, they are not the only ones contemplated. The commission has a broad and general duty to investigate the city's financial affairs as may be thought required, and particularly for the proper exercise of their right to veto appropriations. A storehouse in which to accumulate statistical and other information in convenient readiness for use is a reasonable means for the due discharge of their functions. Clearly the amassing and orderly arrangement of such information is a form and process of investigation. Preparation for matters which may arise and call for prompt action is as much a matter of investigation as an inquiry into some particular policy or method in some branch of the city's business. The statute does not exclude general investigations of a preparatory character and undertaken for general use, as occasion therefor may arise.

By the act the supervisory control of the commission over the expenditure of appropriations and its power to make rules and regulations to govern all the city's business transactions are to be exercised to secure "economy and efficiency." That this purpose is the basic reason for the act in its entirety is self-evident. It seems equally self-evident that if this purpose is to be accomplished, investigation, in the legislative contemplation of authority therefor, should have a wide scope with uncontrolled latitude of freedom for the commission in determining the need of investigation. To obtain information or to have it at hand is a proper purpose of an investigation, and the search for it is, in the ordinary usage of the term, an investigation. The act is clear to the effect that no qualified mean-

ing was intended with a result of exposing the commission to obstruction in its authorized sphere of action and to impairment of its own efficiency.

The commission in its engagement of Lepage and in its agreement with him for the amount to be paid him has acted within its authority.

In respect to the challenge of the validity of the act, the right of the defendants to contest its constitutionality has been considered. In their official capacity the board of mayor and aldermen do not represent the city, its voters, inhabitants, or taxpayers for the purpose of the contest. The record discloses no corporate or other action authorizing the board to have the question litigated, and the authority they have to administer the city's prudential and municipal affairs includes none to seek the defeat of state legislation.

A party may not "question the validity of a law, or of any part of it, unless he shows that some right of his is impaired or prejudiced thereby." *State* v. *Roberts*, 74 N. H. 476, 480. And as a generally established rule, when performance of a ministerial duty by a public officer is sought by *mandamus*, he may not raise the constitutional issue unless he has a personal interest. The rule is particularly enforced against subordinate officials. *Smith* v. *Indiana*, 191 U. S. 138, 148; 6 R. C. L. 92; 12 C. J. 765; 47 L. R. A. 512, *n.*; 24 L. R. A. (N. S.) 1260, note. On the other hand, it has been said: "An unconstitutional act is not a law; it binds no one, and protects no one" (*Huntington* v. *Worthen*, 120 U. S. 97, 101, 102). It is thought that by the better reasoning and practice the defendants should have the right to raise the issue. In defence they say that the law is invalid and hence that there is no law to compel them to act as the petition seeks to have them commanded. Official duty to act is denied, and any ground claimed in denial may be justly and properly litigated.

The broad contention for unconstitutionality of the act is that there is a fundamental doctrine of a right of local self-government which the act violates.

The entire trend and philosophy of our decisions is in denial of the right, and the question can hardly be regarded as unsettled. The exposition in *Wooster* v. *Plymouth*, 62 N. H. 193, 208-211, affirms the course of judicial attitude theretofore expressed upon the subject, and it has since been accepted and followed as the standard and established view. Disaffirmance of the right has been succinctly and concisely announced in *Opinion of the Justices*, 84 N. H. 559, 578, in this language: "Towns are but subdivisions of the state, given certain governmental powers and charged with some local govern-

ment duties. Any part or all of the local duties and obligations may be assumed by the state."

It is not thought that there is occasion to review the cases extensively to ascertain the present state of the law on the subject. There is too slight uncertainty about it. It accords with "the great weight of authority" which "denies *in toto* the existence, in the absence of special constitutional provisions, of *any inherent right of local self-government which is beyond legislative control.*" 1 Dillon, Mun. Corp's, (5th *ed.*) *s.* 98.

As early as 1817 it was said in *Trustees of Dartmouth College* v. *Woodward*, 1 N. H. 111, 133: "The legislature, ... have always claimed and exercised the right of dividing towns; of enlarging or diminishing their territorial limits; of imposing new duties or limiting their powers and privileges, as the public good seemed to require; and this without their consent. Yet this right seems never to have been called in question, on the ground that their charters were contracts," the obligations of which might not be impaired. In 1826 the power of the legislature "to enlarge or curtail the power of towns" was asserted in *Bristol* v. *New-Chester*, 3 N. H. 524, 532. In 1856, in *Berlin* v. *Gorham*, 34 N. H. 266, 275, the court affirmed the legislature's "entire control" over municipalities. In 1881 the view that municipal charters are not contracts was reaffirmed in *Weeks* v. *Gilmanton*, 60 N. H. 500, 502. In 1917 the power of local legislation was regarded as limited by a limitation on the power of the legislature in *Opinion of the Justices*, 78 N. H. 617, 620. And in 1935 the legislative control over municipalities was again declared in general terms, in *Clough* v. *Osgood*, 87 N. H. 444, 447. Thus there has been a consistent and unvarying support of the principle of complete legislative control of local government.

Whatever the conflict of authority with other jurisdictions, the New England states hold uniformly. In *Commonwealth* v. *Plaisted*, 148 Mass. 375, the court held valid a law vesting in the governor authority to appoint officials having local powers and duties. In *State* v. *Williams*, 68 Conn. 131, it was held that a town has no absolute right to regulate its finances and affairs. In *Opinion of the Justices*, 34 R. I. 191, the principle that the legislature is subject to no restraints not imposed by the constitution was invoked and upheld as controlling. In *Montpelier* v. *East Montpelier*, 29 Vt. 12, the rule that municipalities can have no rights and franchises which may become vested as against the state, was laid down. And in *Yarmouth* v. *North Yarmouth*, 34 Me. 411, the court stated the rule

in this manner: "All corporations invested with subordinate powers, for public purposes, . . . are subject to legislative control."

The right of local self-government which the legislature has power to delegate has been confused with a claim of the right without delegation. An "inherence" of the right is advocated on the ground that such government was established and in force when the constitution was ordained. But the constitution did not preserve existing institutions because of the fact of their existence. Unless its provisions demanded their preservation, they had no more than a common-law support for their continuance, which the legislature might terminate or extend in an altered or modified form. The power of the legislature is supreme outside the limitations the constitution states. The theory of a restriction on its power by an "inherence" of right thereto is not in this state a judicial implement of constitutional construction. The sovereignty of the people of the state is represented by their government in completeness of power and authority except only as the constitution places restraints upon it. The state is not a union of locally organized communities or units, but was formed by "The people inhabiting the territory formerly called the province of New Hampshire" (Const., Pt. II, *art.* 1). The community entities were in existence when the constitution was adopted. It recognized their existence and did not destroy them. But they were not parties to, and were not made a part of, the organization of the state government except to the extent the constitution provided. Subject to its specified exceptions, their right to continuance as component parts of the state is unsecured, and continuance is otherwise subject to full regulatory control.

A different question arises when property rights are affected. It is not presented here. Political rights are not property rights, and no vested interest in them may be acquired.

The judicial view has been constantly invoked and employed by the legislature. The state's interest in municipal economy and efficiency is illustrated by the statutes relating to town budgets (P. L., c. 42, s. 74), permitting borrowing in anticipation of taxes (*Ib.*, s. 75), and providing for the issue of municipal bonds (P. L., c. 59), with its sections (*ss.* 6, 7) fixing debt limits. It would shock all citizens concerned for the maintenance of municipal credit to learn that the statutory restraints might be disregarded, but the defendants' position that the state has no interest in the management of the city's financial affairs logically forces them to such a conclusion.

Examples of special legislation relating to the finances of Manches-

ter appear in Laws 1846, *c.* 384, forbidding compensation to aldermen and common councilmen; in Laws 1917, *c.* 333, fixing the salaries of aldermen; in Laws 1919, *c.* 258, specially limiting the city's debt limit and local tax rate; in Laws 1919, *c.* 279, regulating the pay of city employees; and in Laws 1923, *c.* 202, limiting the amount of appropriations for open air concerts.

It is urged that if the state is interested, it must incur the expense of the enforcement and operation of enactments passed on account of such interest. The point hardly deserves notice. The state's interest in the city's welfare does not free the city from chargeability for the expense of the benefit of the state's action taken to secure the benefit. ". . . the finance commission . . . have no duties of a public governmental nature to perform. They act solely for and as agents of the city . . . . Performing only duties theretofore intrusted to officials clearly municipal, the finance commission of Manchester are municipal officers of the city." *Attorney-General* v. *Bond,* 81 N. H. 269, 271. They are local officials although appointed by the Governor and Council.

The argument of invalid legislative delegation of power defeats itself. Admitting the valid delegation if vested in the Board of Mayor and Aldermen, the conclusion is inescapable that the delegation may be reposed in some other municipal agency. Delegation of financial management on a basis of division between two local agencies is as much permitted as its delegation to one agency alone.

The exceptional character and application of the act in contrast with general law on the subject of municipal financial administration, is immaterial. "The equality of the constitution is the equality of persons and not of places—the equality of right and not of enjoyment. . . . No two cities in the state are governed by exactly the same ordinances . . . No two charters are alike . . . ." The "authority" of cities "and their ordinances differ in many particulars. So it is, in perhaps a less degree, with towns." *State* v. *Griffin,* 69 N. H. 1, 30. "These special statutes seem to create an inequality in the rights and privileges enjoyed by towns and cities; but when it is considered that the corporations have no inherent rights in the matter of electing or appointing police officers and prescribing police regulations, the seeming inequality fades away." *Gooch* v. *Exeter,* 70 N. H. 413, 415. A special law varying from a general law and adapted to meet the governmental requirements of a locality may be validly enacted. The practice of enacting laws of such character is embedded in the history of our legislature.

The defendants advance the untenable proposition that by the constitution (Const., Pt. I, *art.* 6) municipalities have the exclusive right of electing "their own public teachers." The article refers only to teachers of "morality and religion," and the exclusive right granted is a "Congregational charter." (*Holt* v. *Downes*, 58 N. H. 170, 176). The constitution (Const., Pt. II, *art.* 83) makes it "the duty of the legislature and magistrates" "to cherish" public education, and the unrestricted legislative control is not doubtful. *Farnum's Petition*, 51 N. H. 376, 380, 381; *Wooster* v. *Plymouth*, 62 N. H. 193, 207; *State* v. *Jackson*, 71 N. H. 552, 553, 554; *Coleman* v. *District*, 87 N. H. 465, 466. Even if the proposition advanced were sound, it would remain that the finance commission is a local agency.

The act is not regarded as in conflict in any respect with the federal constitution. "Speaking generally, the regulation of municipal corporations is a matter peculiarly within the domain of state control." *Braxton County Court* v. *West Virginia*, 208 U. S. 192, 197. The finance commission being a local board, the claim that a state tax is assessed in its entirety against the taxpayers of Manchester must fail. The city is in no wise meeting the expense of a state undertaking.

*Exceptions overruled.*

MARBLE and PAGE, JJ., were absent: the others concurred.